BASIN ELECTRIC POWER COOPERATIVE, Plaintiff and Appellee,

v.

Elcera BOSCHKER, Janice Ann Bauer, Wanda Mae VanderVorste, and Larry VanderVorste, Defendants and Appellants.

BASIN ELECTRIC POWER COOPERATIVE, Plaintiff and Appellee,

v.

James J. MOSBRUCKER; John M. Mosbrucker; Margaret Hatzenbeler; and United States of America, Department of Agriculture; Farmers Home Administration, Defendants and Appellants.

BASIN ELECTRIC POWER COOPERATIVE, Plaintiff and Appellee,

v.

Frank MAICHEL, Defendant and Appellant.

Civ. Nos. 9731–9733.

Supreme Court of North Dakota.

Feb. 28, 1980.

Bair, Brown & Kautzmann, Mandan, for plaintiff and appellee; argued by Malcolm H. Brown, Mandan.

Jos. A. Vogel, Jr., Mandan, Morris A. Tschider, Richard P. Rausch, and Pearce, Anderson & Durick, Bismarck, for defendants and appellants; appearances by Jos. A. Vogel, Jr. and Lawrence A. Dopson, Mandan, argued by Jos. A. Vogel, Jr., Mandan.

ERICKSTAD, Chief Justice.

This is an appeal from an order of the District Court, South Central Judicial District, which denied the defendants' motion for a change of venue. We affirm.

The plaintiff, Basin Electric Power Cooperative [hereinafter referred to as Basin Electric], is a North Dakota corporation engaged in the business of generating and transmitting electrical power to its member rural electric cooperatives. Basin Electric plans construction of two 345-kilovolt alternating current transmission lines from their Antelope Valley Station near Beulah, North Dakota, to an existing switchyard at Leland Olds Station near Stanton, North Dakota, a distance of 28 miles. Also planned for construction is a single 500-kilovolt alternating current transmission line to be erected between the Antelope Valley Station and the Broadland Substation near Huron, South Dakota, a distance of 299 miles. The transmission lines will pass through Mercer, Morton, and Emmons Counties in North Dako-

ta, areas serviced by Oliver-Mercer, Mor-Gran-Sou, and KEM Electric, member cooperatives of Basin Electric.

The North Dakota Public Service Commission approved the line routes for all three transmission lines on February 12, 1979. Thereafter, Basin Electric began negotiations for the acquisition of right-of-way easements. There are 264 North Dakota landowners involved in the easement proceedings, a majority of whom have joined one of three landowner associations organized to express their concerns about the amount of money offered by Basin Electric for the easements. The defendants in the instant cases [hereinafter referred to as the landowners], represent 171 landowners owning property over which Basin Electric seeks to acquire easements to construct high voltage transmission lines.

As stated in Basin Electric's brief to this court, 25% of the needed right-of-way easements were purchased through negotiations. However, disagreements over the issue of compensation resulted in the commencement of condemnation actions on June 18, 1979, which continued throughout the summer months of 1979 in Mercer, Morton, and Emmons Counties.

Because of the number of cases involved, and to ensure administrative convenience, an administrative order was issued on September 19, 1979, from the District Court, South Central Judicial District, which provided, in pertinent part, that all cases in each county would be joined under a single caption so as to simplify the pleadings. The resulting three captioned cases were then consolidated for purposes of the motion for a change of venue.

On October 18, 1979, a motion for a change of venue was made on behalf of the landowners on the ground that it would be impossible for them to obtain fair and impartial trials in their respective counties. The motion was based on three articles which appeared in the North Dakota Rural Electric Cooperative (REC) magazine during the months of June, July, and September of 1979, and a letter sent by the board of directors of Mor-Gran-Sou Rural Electric

Cooperative to its members in August of 1979. The landowners contended that the articles are one-sided, and further, that they were initiated by Basin Electric to prejudice potential jurors against the landowners.

The motion for a change of venue was heard on October 30, 1979, and an order denying the motion was issued on November 5, 1979. The landowners appeal to this court from that order.

■ An order granting or denying a change of venue is appealable. *Kramer v. Heins*, 34 N.D. 507, 158 N.W. 1061 (1916).

An action for the taking of property by eminent domain must be brought in the county in which the subject matter of the action is situated, subject to the power of the court to change the place of trial upon agreement of counsel or as provided by statute. Section 28–04–01, N.D.C.C. A court may change venue "[w]hen there is reason to believe that an impartial trial cannot be had . . ." in the county where the action is pending. Section 28–04–07(2), N.D.C.C.

■ We have often held that a motion for a change of venue is addressed to the discretion of the trial court, and an order granting or denying such a motion will not be overturned on appeal in the absence of a manifest abuse of discretion. *Hanson v. Garwood Industries*, 279 N.W.2d 647 (N.D. 1979); *Knoepfle v. Suko*, 114 N.W.2d 54 (N.D.1962); *Sand v. Queen City Packing Co.*, 108 N.W.2d 448 (N.D.1961). Further, the burden is on the party moving for a change of venue to show that a fair and impartial trial cannot be had in the county from which the transfer is sought. *Hanson v. Garwood Industries, supra* at 649; *Jamestown Plumbing & Heating Co. v. City of Jamestown*, 189 N.W.2d 656 (N.D.1971); *Knoepfle v. Suko, supra* at 56. Therefore, the narrow issue on appeal is whether or not the district court abused its discretion in denying the landowners' motion for a change of venue. With these considerations in mind, we must examine the evidence that the district court was confronted with in making its determination.

At issue are three articles which appeared in the North Dakota Rural Electric Cooperative (REC) magazine, a monthly publication distributed to consumers who are serviced by subscribing cooperatives of the North Dakota Association of Rural Cooperatives. Subscribing cooperatives include Oliver-Mercer Electric which serves Mercer County, Mor-Gran-Sou Electric which serves Morton County, and KEM Electric which serves Emmons County. The magazine is distributed to all North Dakota counties with the exception of Cass and Cavalier.

Approximately ten days before condemnation actions commenced in Emmons County, an article appeared in the June 1979 edition of the REC magazine. The article, entitled "Electricity Flows Both Ways in Power Line," included a discussion of the problems surrounding the dispute between the landowners and Basin Electric over the construction of high voltage transmission lines in North Dakota. The article indicated that problems arose when the landowner associations suggested a base price of at least $30,000 per mile of easement, an amount five times the average price per mile of easement awarded landowners in South Dakota after negotiations with Basin Electric.

The June article stated that the landowners were entitled to "just compensation" under North Dakota law for the acquisition of easement rights, and added that Basin Electric's offer to the landowners was based upon such "just compensation" as determined by fair market values of the acreage involved. The fair market value of the land involved in North Dakota had, according to the author, been appraised at an average price of $7,600 per mile.

Also appearing in this controversial column was a cost-summary sheet which, along with the discussion contained therein, denoted that Basin Electric's position towards the landowners' proposal was that the $30,000 per mile of easement was excessive, and if paid, would add millions to the cost of the project. The article further said that this additional cost would in turn be passed on to the rural consumers in the form of increased electrical costs. The cost-summary sheet depicted a total additional cost to Basin Electric of $28,867,000, this amount representing the minimum additional cost which the rural consumers would pay through their electricity bills.

The landowners contend that the June article in the REC magazine was one-sided, prejudiced potential jurors, and served two basic purposes for Basin Electric:

(1) The article implied that the landowners were not asking for "just compensation" as evidenced by their proposed base price of $30,000 per mile of easement, an amount five times the average price per mile of easement awarded to landowners for easement rights in South Dakota; and

(2) The article indicated that if Basin Electric agreed to the landowner group's proposal, it would set a new and much higher level of compensation for electric distribution and transmission lines, which would be passed on to the reader-consumers in the form of increased electrical costs.

The second article at issue appeared in Basin Electric's monthly column in the July 1979 edition of the REC magazine. The publication was entitled ."Discuss Power Line Routing" and, according to the landowners' attorney, had been "toned down considerably" in comparison to the June article.

The July article reiterated Basin Electric's established policy that it would refuse to negotiate with the landowner associations for the acquisition of individual easements. The article also included a discussion by Basin Electric's chief engineer, wherein he addressed several concerns expressed by landowners about the construction of high voltage transmission lines. He stated that adverse effects from high voltage transmission lines were quite remote.

It is undisputed that the July article was written by the Basin Electric staff and approved by one of the directors.

The third article, offered in support of the motion for a change of venue, appeared in the September 1979 issue of the REC magazine. The column was an interview with Andy Mork, Basin Electric Director, and it consisted of excerpts from Mork's experiences and observations at the Essa High Voltage Demonstration Center near Toronto, Ontario. Mork, and several other North Dakotans involved with and affected by Basin Electric's proposed construction of high voltage transmission lines in North Dakota, took part in a tour of the testing facility in order to obtain information about the effects of high voltage lines on various aspects of the environment.

The article contained a discussion of numerous demonstrations Mork observed at the testing facility, and his conclusion that, despite landowners' concerns, there were no dangerous effects from high voltage transmission lines.

In addition to these three articles published in the REC magazine during the summer of 1979, the board of directors of the Mor-Gran-Sou Electric Cooperative sent a letter to its members on August 3, 1979, which the landowners contend further prejudiced potential jurors and prohibited them from obtaining a fair and impartial jury.

The letter contained a discussion on the costs of easements being acquired for the construction of transmission lines and pointed out, as two of the articles referred to above had also done, that Basin Electric had acquired 96% of the needed easements in South Dakota through negotiations, at an average price of approximately $6,000 per mile. Included in the letter was a statement that North Dakota law provides that just compensation be paid for the acquisition of right-of-way easements, and that "just compensation has been defined in the courts as the loss in value which occurs to the property as the result of the easement." The letter stated that this was the basis for the offers being made in North Dakota to landowners.

This letter further stated that a group of landowners in North Dakota were asking for easement payments which amounted to several times the value of the land contained in the right-of-ways asked for.

John Allen, manager of Mor-Gran-Sou, admitted in a deposition filed with the district court that the letter at issue was written from information received from Basin Electric and was sent to Basin Electric for comments prior to distribution. The letter was distributed approximately two weeks before condemnation actions were commenced in Morton County.

After considering the pleadings, affidavits, depositions, and exhibits introduced in support of the motion for a change of venue, as well as those documents offered in opposition thereto, the district court reached the following conclusion in its memorandum opinion of November 2, 1979:

"(1) Even though the objectionable materials are such that they can be said to have an effect on jurors, publication has not been so recent or widespread to leave me with the impression that there is a reasonable likelihood of inability to furnish an impartial trial. We have a high percentage of jurors who have not been exposed.

"(2) Realizing that the percentage of exposed jurors may vary from panel to panel, voir dire examination stands as an effective alternative to venue change to assure an impartial trial.

"(3) In the event voir dire examination shows that impartial trial cannot be had, the motion for change of venue can be renewed thereby furnishing the final assurance of an impartial trial."

To support their contention that the pretrial publicity in the instant case so prejudiced potential jurors in the three counties that a fair and impartial trial cannot be had, the landowners rely on *Olson v. North Dakota Dist. Court, Etc.,* 271 N.W.2d 574 (N.D.1978), and the factors enumerated therein for the district court's consideration in determining whether or not to grant a change of venue.

■ In *Olson,* we set forth several factors to be considered by a trial court in its determination of whether or not pretrial

publicity has had such a prejudical effect on a criminal defendant as to justify a change of venue. Those factors for consideration, in pertinent part, are: (1) whether or not the publicity was recent, widespread, and highly damaging to the defendant; (2) whether or not the prosecution was responsible for the objectionable material, or if it emanated from independent sources; (3) whether or not inconvenience to the prosecution and the administration of justice will result from a change of venue or continuance; and (4) whether or not a substantially better panel can be sworn at another time or place.[1]  *Olson v. North Dakota Dist. Court, Etc., supra* at 580; *see* Explanatory Note, Rule 21, N.D.R.Crim.P.

We recognize that the factors set forth in *Olson* for the trial court's consideration on a motion for a change of venue apply to criminal cases. However, we believe that these criteria are also relevant for consideration by a trial court in a civil action when the defendant contends that pretrial publicity has had such a prejudicial effect on potential jurors as to justify a change of venue. *See Central Auto Co. v. Reichert,* 273 N.W.2d 360 (Wis.App.1978). Nevertheless, we believe that the landowners' reliance on the *Olson* case is misplaced.

*Olson* is distinguishable from the instant case in that it was an original proceeding brought by the defendant to obtain a supervisory writ directing the trial court to grant a change of venue in a well-publicized murder case. The pretrial publicity was widespread, and consisted of approximately 56 news articles carried in the *Fargo Forum* over a span of less than two years. The articles covered the arrest, pretrial proceedings, the trial and the sentencing of the defendant for the murder of his wife, as well as the subsequent murder of a sixteen-year-old West Fargo girl for which the defendant had been charged. Further, there had been extensive television coverage of the two murders prior to the trial.

The pretrial publicity in *Olson* created a substantial and reasonable likelihood that a fair and impartial trial could not be had in Cass County. This was recognized by the trial court in moving the trial of the murder of a West Fargo girl named Pollie Johnson to Wahpeton in Richland County. We moved it to Minot in Ward County to more fully meet the problem. Justice required the issuance of a supervisory writ to compel the trial court to grant a change of venue to Ward County, an area in which the Fargo Forum had less circulation and the television news did not reach. The pretrial publicity in the instant case is not nearly as inflammatory nor widespread as in *Olson.*

The three articles which appeared in the REC magazine were disseminated primarily to rural consumers of electricity in North Dakota. Complimentary copies of the magazine were also sent to various business establishments throughout the three-county area. The letter at issue was sent to members of the Mor-Gran-Sou Electric Cooperative, which serves Morton County.

Despite the landowners' contention, the three counties out of which this appeal arose—Mercer, Morton, and Emmons—are not predominantly rural. According to the population figures set forth in the landowners' brief, Morton County's total population is approximately 25% rural; Mercer County is 29% rural; and Emmons County consists of approximately 56% rural population.

■ Although these figures serve as a guide in determining the extent of the REC magazine's distribution, it is impossible at this point in the proceedings to determine the number of potential jurors who had access to the magazines, and further, to determine the number of potential jurors who actually read the objectionable articles, believed what they read, and were prejudiced against the landowners as a result.

1.  This court in *Olson* also recognized four additional factors for consideration on a motion for a change of venue in a criminal case, namely: (1) the nature and gravity of the offense; (2) the size of the community; (3) the status of the defendant in the community; (4) the popularity and prominence of the victim(s). *Olson v. North Dakota Dist. Court, Etc., supra,* 271 N.W.2d at 580. However, these factors were not addressed by the parties to this action nor are they relevant to this case.

No abuse of discretion will be inferred merely because "some persons in the county may have a prejudice in the case, if, notwithstanding such persons, a fair and impartial trial can be had within the county." *Knoepfle v. Suko,* 114 N.W.2d at 55.

We recognized in the recent case of *State v. Engel,* 289 N.W.2d 204 (N.D. 1980), that the usual practice is for the trial court to defer ruling on a motion for a change of venue until or upon completion of the voir dire examination. The reason is that the existence of prejudice, if it exists at all, can generally be determined through voir dire examination of potential jurors. A change of venue is an extraordinary remedy. *Olson v. North Dakota Dist. Court, Etc.,* 271 N.W.2d at 583. Ordinarily, the appropriate time to determine whether or not it is impossible to select a fair and impartial jury, and, therefore, to invoke such a remedy, is during voir dire examination. *State v. Engel, supra* ; *see* Explanatory Note, Rule 21, N.D.R.Crim.P. We conclude that the record before us does not disclose an abuse of discretion in the trial court, in effect finding that the landowners failed to meet their burden of showing that fair and impartial trials cannot be held in the counties from which the transfers are sought.

Even if we assume, for the sake of argument, that Basin Electric was primarily responsible for the objectionable material, that is only one of the factors to be considered by the trial court in determining whether or not a change of venue should be granted. The ultimate question is whether or not it is impossible to select a fair and impartial jury, a question that can best be answered upon completion of voir dire examination.

Counsel for the landowners contends that voir dire may be inadequate because (1) the trial court may limit the extent and scope of the examination, and (2) jurors are reluctant to admit bias or prejudice.

In addressing the first concern, we encourage the trial court to allow both parties great latitude on voir dire examination in order to disclose the existence of any prejudice or bias on the part of potential jurors. Extensive voir dire should help insure the selection of a jury panel reasonably free of taint or prejudice. However, in regard to the second concern expressed by counsel, if that is a valid contention, it attacks our jury system itself. Because we believe that jurors in North Dakota have a high regard for the truth, the oath, and our judicial system, we reject the contention to the contrary implicit in that expressed concern. *See Olson v. North Dakota Dist. Court, Etc.,* 271 N.W.2d at 578, n. 1.

Counsel for the landowners also argues that the three articles and letter at issue incorrectly state the law on eminent domain in North Dakota, and therefore potential jurors will have a mistaken view of the law as it applies to the compensation to be awarded landowners for the acquisition of right-of-way easements. More specifically, counsel asserts that the articles leave the reader with the impression that "just compensation" under the laws of eminent domain only includes the value of the land taken for the easements, and does not include severance damages.

In order to alleviate any misconceptions or misunderstanding of the law, we ask that the trial court give preliminary instructions on the law of eminent domain as it relates to the compensation to be awarded a landowner for land taken including severance damages. We ask that such preliminary instructions be given *prior to* voir dire examination in order to eliminate any preconceived notions potential jurors may have about the damages to be awarded in condemnation actions.

In accordance with this opinion, the order of the district court denying the motion for a change of venue is affirmed subject to two conditions:

(1) That the trial court allow great latitude on voir dire examination in order to disclose the existence of any prejudice or bias on the part of potential jurors; and

(2) That prior to voir dire examination, the trial court give preliminary instructions to the jury panel on the law of eminent domain as it relates to the com-

pensation to be awarded a landowner for the land taken including severance damages.

We do not believe the district court abused its discretion in denying the motion for a change of venue. If the voir dire examination of potential jurors reveals the impossibility of empaneling a fair and impartial jury, the landowners may renew their motion for a change of venue at that time.

The order of the district court is affirmed, and the cases are remanded for further proceedings consistent with this opinion.

VANDE WALLE, PEDERSON, PAULSON and SAND, JJ., concur.